**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

CHRIS DOWLING on behalf of himself
and all others similarly situated,

*Plaintiff,*

v.

QUEENS BALLPARK COMPANY, L.L.C.
and DOES 1-10,

*Defendants.*

Index No. 1:24-cv-07092-VMS

**CORRECTED AMENDED CLASS
ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Chris Dowling ("Plaintiff"), on behalf of himself and all others similarly situated, brings the following Class Action Complaint (the "Complaint") against the above-captioned Defendants, Queens Ballpark Company, L.L.C. (the "New York Mets"), and Does 1–10 (collectively, "Defendants"), and alleges as follows:

I.    **INTRODUCTION**

1.    This putative class action (hereinafter, the "Action") concerns the biometric privacy of the citizens and visitors of the City of New York.

2.    Citi Field, the home of Major League Baseball's New York Mets franchise as well as numerous concerts and other events each year, is a commercial establishment located within the city limits of the City of New York that provides entertainment services as a professional sports and concert stadium. Defendants, under New York City's Local Law 2021/003 (the "New York City Biometrics Law"), collect biometric identifiers from its visitors. Biometric identifiers encompass "*any*

*physiological or biological characteristic that is used by or on behalf of a commercial establishment, singly or in combination, to identify, or assist in identifying, and individual, including but not limited to [...] a retina or iris scan, [...] a fingerprint or voiceprint [...] a scan of the hand or facial geometry, or any other identifying characteristic.*"[1]

3.    In violation of the New York City Biometrics Law, Defendants illegally sell, lease, trade, and/or share biometric identifier information for value or otherwise profit.

4.    Specifically, Defendants use facial recognition and collect facial templates, and previously failed to disclose the collection, retention, conversion, storage, and/or sharing of those biometric identifiers, in addition to the selling, leasing, trading, and/or sharing those biometric identifiers to the detriment of consumers. Indeed, Defendants admit to the collection of biometric data from Plaintiff and Class members; however, Defendants' unlawful use of biometric identifier information for value or profit violates the New York City Biometrics Law. Defendants' unlawful use of biometric identifier information is done so for value or profit because each time a consumer buys a ticket for a sporting event or concert at Citi Field, they pay a price premium for security which is baked into the overall ticket price.  And, each time a consumer enters the stadium, their valuable biometric information is collected, which allows Defendants to continue to charge a price premium for the security that is provided (in addition to saving Defendants money

---

[1] **Ex. A**, 2021 N.Y.C. Local Law No. 3, N.Y.C. Admin. Code § 22-1201.

on the cost of labor for security services as well).  However, had Plaintiff known that his biometrics were being taken, and had Plaintiff known that Defendants were profiting off of the collection of his valuable biometric data, then he either would have paid less for the tickets purchased or would not have purchased those tickets at all.

5.    Plaintiff Dowling, on behalf of himself and all others similarly situated, brings this Action under New York City Biometric Law's private right of action[2] for the negligent, reckless, or intentional violation of the statute. Thus, Plaintiff, on behalf of himself and all other similarly situated, brings this Action for statutory damages, reasonable attorneys' fees and costs, and injunctive relief to enjoin the unlawful behavior pled herein.

## II.    <u>PARTIES</u>

### *Plaintiff Chris Dowling*

6.    Plaintiff Chris Dowling is a citizen of New York. Defendants unlawfully collected Plaintiff's biometric identifier information, and thus, the Plaintiff was harmed.

7.    Plaintiff attended at least four New York Mets games at Citi Field within one year of the filing of this Action.

### *Defendant Queens Ballpark Company, L.L.C.*

8.    Defendant Queens Ballpark Company, L.L.C. is a New York limited partnership with its principal place of business in Queens, New York. Defendant is

---

[2] *Id.* at § 22-1203.

CLASS ACTION COMPLAINT - 3

associated with the New York Mets, a professional baseball team and uses facial recognition on its fans who attend games at Defendant's stadium, Citi Field.

9.      The New York Mets own Citi Field. This means that the New York Mets control the venue for both baseball games for their own team as well as concerts and other events that are held at the stadium.

### *Doe Defendants 1–10*

10.     Doe Defendants are parties that might be later unveiled in the discovery portion of this Action that are involved in the collection, retention, sale, or sharing for profit of biometric identifiers and information.

## III.   JURISDICTION

11.     *Subject Matter Jurisdiction.*  This Court has subject matter jurisdiction over the Action pursuant to the Class Action Fairness Act, 28 U.S.C. 1332(d).  This is because this Action: (1) involves millions of putative class members; (2) there is minimal diversity between at least one member of the putative Class other and the Defendant and (3) in the aggregate, the claims of Plaintiffs and the putative Class exceed the sum or value of $5,000,000, exclusive of costs and interest.

12.     *Personal Jurisdiction.* This Court has personal jurisdiction over the New York Mets because they maintain their principal place of business in this County within the State of New York. This Court further has personal jurisdiction over Defendants because they unlawfully collected biometric identifier information from Plaintiff and Class members (and, therefore caused harm) in this County, and the events giving rise to this Action occurred within the State of New York.

13.    *Venue.*    Venue is proper in this Court against because Defendants maintain their principal places of business in this County.

## IV.    FACTUAL ALLEGATIONS

### A.    The Critical Significance of Biometric Information

14.    Biometric identifiers come in a variety of forms, including traditional fingerprints, as well as palm prints, iris/retinal scans, and scans of the facial geometry (facial recognition), and are unique to each person. Thus, they uniquely identify an individual and cannot be changed or deleted.

15.    Biometric security is important for numerous reasons, including creating a specific link between an individual and a data record; thwarting fraud efforts to create fake digital identities; and creating a form of identification which is not exchangeable.[3]

16.    It follows then that a person's biometric identifiers are extremely valuable and must be protected with even more than the precautions that one would normally take when protecting other forms of identification, like credit card numbers, passports, and social security cards.

17.    Biometrics can also be used by consumer businesses to identify consumers and tie a subset of data to that consumer, including their credit card number. This creates a rich reservoir of information (consumer buying history, purchasing habits, medical history for services paid with that credit card, etc.) that

---

[3] MITEK SYSTEMS, "Looking ahead: 7 reasons why biometric security is important for digital identity" (Aug. 30, 2019), https://www.miteksystems.com/blog/looking-ahead-7-reasons-why-biometric-security-is-important-for-digital-identity.

is readily accessible when a consumer's biometric identifier appears and matches the identifiers which are stored by that consumer business. This allows the consumer business to quickly identify consumers and access a trove of information – whether it be consumer information, criminal history, or other information – at a moment's notice.

18.     As explained by Bayometric, which provides fingerprint scanning:

> Verification and identification are the two ways in which an individual's identity can be determined using biometric technology. Verification confirms that a person is indeed who they claim to be and performs a one-to-one comparison of the individual's [biometric] sample with a stored reference template. Identification, on the other hand, performs a one-to-many comparison to confirm an individual's identity. The identification process compares the individual's [] sample against all the reference templates stored on file. An individual is positively identified if the individual's [] image matches any of the stored templates.[4]

19.     Consumers are left entirely helpless and vulnerable when consumer businesses take their biometric information; the situation is much like taking a person's social security or credit card number without their consent, but consumers cannot be separated from their biometric consumer information. Biometric identifiers cannot be replaced like a stolen credit card.

20.     Legislatures have correctly identified that the privacy rights tied to biometric identifiers are worthy of protection by statute. As such, state legislatures

---

[4] Mary Clark, BAYOMETRIC, "Importance of Biometric Fingerprinting Technology: Does Your Organization Really Need It? This Will Help You Decide!," https://www.bayometric.com/importance-of-biometric-fingerprinting-technology/.

and city counsels across the country have either passed, or are considering, biometric privacy statutes to protect the privacy rights of their constituents.

21.    Like other personally identifiable information ("PII"), biometric information has intrinsic value.  Often, biometric information has a higher value than ordinary PII (like a Social Security number) because biometric information cannot be changed and cannot be modified, whereas other PII generally still can be changed.

22.    Indeed, in 2023, the value of the U.S. biometrics market (the actual industry involved in the collection and usage of biometrics) valued at nearly $9.98 billion.  In previous litigation, the value of biometrics has been pegged at an exact dollar amount per person – the same way which PII is often assigned a value based off of its resale value on the dark web.

23.    According to the Richmond Journal of Law and Technology (Volume XV, Issue 4):

> PII is an exceptional resource that companies can use for internal purposes or to sell to other companies…. Due, in part to the use of PII in marketing decisions, commentators are conceptualizing PII as a commodity.  Individual data points have concrete value, which can be traded on what is becoming a burgeoning market for PII.  The value of the data increases when combined to provide information, such as consumer preferences that are not discernable from the data points individually.  As a result, companies are maintaining, sharing and selling dossiers of millions of consumer preferences… The potential for increased profits and cost savings serve as a substantial impetus for companies to ensure and cost savings serve as substantial impetus for companies to ensure that their actions do not compromise access to this valuable resource.

**CLASS ACTION COMPLAINT - 7**

24.     PII in any instance is valuable to companies who use it for a variety of purposes, such as to target specific consumers or, as here, to save money on labor related to security costs.

25.     This is even more evident in the data driven environments that allow companies (like third party vendors who collect PII, such as biometric information) to function.   Data breaches and the loss of valuable PII are evidence of this functionality.  In data breach litigation, the loss of value for PII is compensable, and there is no reason the same logic should not apply to the use and profiting off of the most valuable type pf PII: biometric information.

26.     As courts around the country have adapted to a new landscape that allows PII to be monetarily valued, so too has biometric information,   Indeed, that is the very reason biometric laws are being passed from coast-to-coast with such high statutory penalties: because legislatures, like the New York City Council, recognize that laws are necessary to protect biometric information.

27.     The Federal Trade Commission ("FTC"), empowered under the FTC Act, has taken action to protect the value of biometric information.  According to the FTC's Policy Statement of the Federal Trade Commission on Biometric Information and Section 5 of the Federal Trade Commission Act:

> Even outside of fraud, uses of biometric information or biometric information technology can pose significant risks to consumers.... Moreover, without clear disclosures and meaningful choices for consumers about the use of biometric technologies, consumers have little way to avoid these risks or unintended consequences of these technologies.

**CLASS ACTION COMPLAINT - 8**

28.    The FTC states that the "use of biometric information technology may be an unfair practice within the meaning of the FTC Act":

> As discussed … the collection of biometric information can create a serious risk of harm to consumers.  Such harms are not reasonably avoidable by consumers if the collection and use of such information is not clearly and conspicuously disclosed or if access to goods and services is conditioned on providing the information.  For instance, if businesses automatically and surreptitiously collect consumers' biometric information as they enter or move through a store, the consumers have no ability to avoid the collect or use of that [valuable] information.

29.    As the collection and use of biometric information continues to develop, it is imperative that agency and legal guidance regarding the sensitivity and value of biometric information is taken seriously.

**B.    New York City's Biometric Privacy Law**

30.    The New York City Council passed Local Law 3 in 2021 in an effort to help protect the privacy rights of the citizens of the City of New York.

31.    Specifically with respect to entertainment venues, the New York City Council stated in its committee report:

> As early as the early 2000's, facial recognition technology has been on the rise at entertainment venues. In January 2001, facial recognition technology was installed at the Raymond James Stadium by the Tampa Police Department to scan the faces of Super Bowl attendees. Since then, this technology has proliferated, and is now used at several entertainment venues including Madison Square Gardens and Barclays Center. In 2018, Live Nation and Ticketmaster invested in Blink Identity, a company that specializes in military-grade facial recognition software.
>
> The details surrounding how this technology will be used is closely guarded, but venues claim that the technology is needed for security and operational purposes in order to determine who is allowed into the building. For example, some of artists, like Taylor Swift, use this technology at concerts to track stalkers.

**CLASS ACTION COMPLAINT - 9**

Venues also use this technology to identify employees and vendors. Barclay's Center, in Brooklyn, has teamed up with IDEMIA, which manages the Transportation Security Administration's PreCheck program, to offer expedited entry lines. Similarly, Live Nation claims that they intend to use the technology to improve the customer experience by linking tickets to faces and offering tailored services.

It is unclear how the data collected through facial recognition technology is managed and stored by entertainment venues. Facial recognition technology can often determine the age range and likely gender of concertgoers. Technology experts warn that this data could be collected and sold to third parties for marketing purposes without the consent of consumers. Several artists and activists have begun to speak out on the use of the technology. Fight For the Future, a nonprofit digital rights group, is campaigning to ban facial recognition software as a law enforcement tool, and recently launched a campaign against the use of the technology at concerts and festivals. Tom Morello, of Rage Against the Machine, Amanda Palmer, Downtown Boys, Anti-Flag, and others have spoken up in support of the campaign. Some musicians have expressed concerns that the technology will be used to target undocumented immigrants. In response, several music festivals, including the Governor's Ball, in New York City), Bonnaroo in Tennessee, Punk Rock Bowling, in Las Vegas, Electric Forest in Michigan, and Austin City Limits announced that they would not be using the technology.[5]

32.    As such, the New York City Council felt that entertainment venues, such as the one that Defendants operate, should not have complete, unfettered power to use facial recognition and other types of biometric identifier collection in their facilities.

## C.    Defendants' Collection of Biometric Identifier Information

33.    Defendants collect biometric identifiers at Defendant's home stadium, "Citi Field," which is located in New York City, in the borough of Queens.

---

[5] **Ex. B**, N.Y.C. City Council, Committee Report 10719 (Oct. 7, 2019).

**CLASS ACTION COMPLAINT - 10**

34.    According to an article about Citi Field in 2018,

security blends both personnel and technology to secure fans and players during the game. **Facial recognition technology is deployed through 11 cameras at the main fan entrance, and faces are checked against a blacklist. If the camera detects a "Do Not Admit" – someone who has been arrested onsite before for fighting, larceny or assault, for example, and banned from future Citi Field events – the security operator calls down to the officer at the entrance to approach the person, ask for his or her ID, and if they match the blacklisted person, the matter is handed over to the NYPD as a trespassing violation.**[6]

35.    Below is an image of Citi Field at the main entrance. Cameras, which may be the ones described by Defendants that are used for facial recognition purposes, can be seen in pairs on the columns of each pillar:

---

[6] SECURITY MAGAZINE, "Security in the Outfield" (Aug. 30, 2018), https://www.securitymagazine.com/articles/89369-security-over-center-field.

**CLASS ACTION COMPLAINT - 11**



36.    This means that Defendants collect biometric identifiers from fans as they enter the premises.

37.    With respect to how Defendants collect biometric identifiers, Citi Field "also monitors the field's 187 surveillance cameras and 115 doors and card readers through the Genetec Command Center platform."[7] Genetec Inc. is a software company that provides various types of security software to its customers, like Defendants. According to Genetec, its technologies allow for a range of different capabilities, but all data collected by a given customer, like Citi Field, remains locally stored on that customer's systems.

---

[7] *Id.*

38.     Additionally, on Reddit, Mets fans have detailed the use of facial recognition by Citi Field which has been weaponized against them. For example, just one year ago, Reddit user "jahpizzie" stated:

> In 2008, I was wrongfully arrested at [the Mets' stadium that predated Citi Field]. I have been to at least 60 games at Citi Field. The day before Fathers Day [2023] I was there with my wife and kids and security walked up to me and asked [if] I was (my name). I said yes and he had to call his supervisor because I have been "banned" since 2008. When the supervisor came with 7 uniformed officers, he told me I was "officially not banned" I told him I've been to a ton of games since then and he seemed surprised then told me **that [Citi Field] started [using] facial recognition [in 2022] and that this year[, 2023,] it is in full effect.**

39.     On Reddit, another user, much to their dismay, stated:

> I thought everyone was [aware of Citi Field's use of facial recognition]? If you look at the iPad screens at the [Citi Field] rotunda gates entrance, you can see it picking up faces like your phone camera does with the box and running the scan. And when the scan triggers something, they halt the line.

> I realized it [in 2023] when [the Defendant] made me take off my hat to walk through the metal detector. I was confused [be]cause the detector would pick up anything I am trying to hide in my hat! After the third time, I realize[d] it was because my hat was hiding my face and blocking their scan.

> I do not like it one bit.

40.     Defendants use facial recognition to financially profit. *First*, Defendants increase their profit margin when they choose to use facial recognition as opposed to using manual labor to adequately protect its 400,000 square foot premises. which would be tasked with the same security responsibilities.

41.     *Second*, Defendants also sell tickets for baseball games and concerts at a premium price because the price includes costs related to this level of security;

**CLASS ACTION COMPLAINT - 13**

however, had Plaintiff and Class members known that this premium price also included the surreptitious collection of their biometrics, they would have never paid premium prices (or bought a ticket to Citi Field at all).

42.    *Finally*, Defendants intentionally violated the aforementioned statute, which forbids sharing of biometric information for anything of value; here, the "thing of value" is the contract between Defendants and non-party Genetec, and the profit made when Defendants save money on security and make further profit from a premium ticket price.

### D.    Defendants' Collection of Plaintiff Dowling's Biometric Identifier Information

43.    Plaintiff attended a Mets game at Citi Field on at least four occasions within the past year.

44.    While attending the event, Defendants collected Plaintiff's biometric identifiers.

45.    At that time, Defendants did not disclose that they were collecting Plaintiff's and the Class members' biometric identifiers. Defendants unlawfully collected Plaintiff and Class members' biometric information, and compared their facial biometric data to that of other people on Defendants' "blacklist" at Citi Field. Then Defendants shared images with a third party, possibly Genetec, to process Plaintiff and Class members' facial biometric data upon entry into Citi Field. Defendants did this for profit: to save on security costs and to be able to charge a premium baked into event ticket prices with respect to security.

46.     As such, by way of the New York City Biometrics Law and the deeply personal privacy rights protected by that statute, Plaintiff and all other class members were harmed by Defendants' conduct.

## V.    CLASS ACTION ALLEGATIONS

47.     Plaintiff seeks to certify a class consisting of all persons who fall under the following definition ("Class Definition" or, the "Class"):

> **Class Definition**. All consumers who visited Citi Field for a sporting event or concert from the enactment of the relevant statute on July 9, 2021 through present who had their biometric identifiers collected as a result of Defendants' conduct alleged herein.

48.     Excluded from the Class are Defendants' officers, directors, and employees; and their affiliates, legal representatives, attorneys, successors, heirs, and assigns. Also excluded from the Class are members of the judiciary to whom this case is assigned, their families, and members of their staff.

49.     **Numerosity.**  The members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the Class consists of well over 100,000 individuals.

50.     **Commonality.** There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation, whether the Class Members' biometric information was taken by Defendants in violation of New York City's Biometrics Law.

51. **Typicality.** Plaintiff's claims are typical of those of other Class Members because Plaintiff's biometric information was taken by Defendants, like that of every other Class Member.

52. **Adequacy of Representation.** Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel are competent and experienced in litigating Class actions.

53. **Predominance.** Defendants have engaged in a common course of conduct toward Plaintiff and Class Members, in that all of Plaintiff's and Class Members' data was taken by Defendants. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

54. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer

**CLASS ACTION COMPLAINT - 16**

management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

55.     Defendants have acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

## VI.     CAUSES OF ACTION

**COUNT I**
**2021 N.Y.C. Local Law No. 3,**
**N.Y.C. Admin. Code § 22-1202(b)**

56.     Plaintiff restates and realleges paragraphs 1-35 as if fully alleged herein.

57.     Under the New York City Biometrics Law, "[i]t shall be unlawful to sell, lease, trade, share in exchange for anything of value or otherwise profit from the transaction of biometric identifier information."

58.     Plaintiff and Class members' biometric identifiers were used to identify them, and, therefore, constitute "biometric identifier information" as defined by the New York City Biometrics Law.

59.     As described above, Defendants shared, sold, leased and/or traded biometric identifier information with third parties by collecting facial recognition scans upon entrance to Citi Field.

60.     Defendants violated and continue to violate the statute by selling, leasing, trading, sharing in exchange for anything of value, or otherwise profiting from the transaction of Plaintiff and the Class' biometric identifier information.

Specifically, Defendants have received both monetary (in the form of price premiums) and non-monetary (savings on physical security and additional safeguards which are then replaced with biometric surveillance) benefits in exchange for the biometric information that they unlawfully collect from Plaintiff and Class members.

61.    Defendants did so intentionally or recklessly.

62.    Alternatively, Defendants did so negligently.

63.    Thus, the Plaintiff and the Class were harmed and are entitled to the relief requested by this Complaint.  Under New York City Biometrics Law, Defendants are liable to Plaintiff and each Class member damages of $5,000 for each intentional or reckless violation of the statute.

## COUNT II
## New York General Business Law § 349

64.    Plaintiff restates and realleges paragraphs 1-35 as if fully alleged herein.

65.    Defendants are considered "businesses" under New York General Business Law § 349 ("GBL 349").

66.    Defendants' business acts and practices are unfair and deceptive under GBL 349.  New York has a strong public policy of protecting consumers' privacy interests, including their biometric privacy.  Defendants violated GBL 349 by collecting Plaintiff and Class members' biometric data without written consent and did so in order to profit, as explained herein.

67.    Defendants' acts and practices are "unfair" in that they are immoral, unethical, unfair, oppressive, unscrupulous, and/or substantially injurious to

consumers.  The gravity of the harm of Defendants secretly collecting and sharing Plaintiff's biometric data is significant and there is no corresponding benefit resulting from such conduct.  Finally, because Plaintiff and many Class members were completely unaware of the full breadth of Defendants' conduct, including the use of their biometric identifier information for profit, they could not have avoided the harm caused by this conduct.

68.    Under GBL 349, Plaintiff seeks all available remedies, including actual damages, restitution, treble damages, statutory damages, reasonable costs and attorneys' fees, and any other relief this Court deems just and proper.

**COUNT III**
**Unjust Enrichment**

69.    Plaintiff restates and realleges paragraphs 1-35 as if fully alleged herein.

70.    A plaintiff has a claim for unjust enrichment when the defendant was enriched at the plaintiff's expense, and it is against equity and good conscience to permit the defendant to retain what is sought to be recovered.

71.    Because Defendants failed to disclose that they collect, retain, convert, store and share biometric information, Plaintiff and other Class members who entered the stadium would not have purchased tickets to the venue (or would have paid substantially less for them) if they had known they were also paying in the form of their valuable biometric data.

72.    At bottom, the visits to Citi Field enriched Defendants at Plaintiff's expense because it allowed Defendants to save on security costs and to charge an

unjustified premium for the price of tickets to the venue.  It is against equity and good conscience to permit Defendants to retain the money they received from Plaintiff and the members of the Class under these circumstances.

73.    Defendants are therefore liable to Plaintiffs and members of the Class for the profit that Defendants earned from the sales of tickets to New York Mets games and concerts at Citi Field due to Defendants' use of Plaintiff and Class members' biometric data for profit, at all times.

## VII.    REQUEST FOR RELIEF

74.    WHEREFORE, Plaintiff seeks a judgment as follows:

A.    an Order certifying this Action as a class action and appointing Plaintiff and their Counsel to represent the Class;

B.    statutory damages awardable by the statute plead herein;

C.    equitable relief requiring Defendants to make the necessary disclosures with respect to biometric identifier information collection and retention;

D.    attorneys' fees, costs, and other damages to be awarded in an amount to be determined as allowable by law;

E.    reasonable expert witness fees;

F.    pre- and post-judgment interest on any amounts awarded; and,

G.    such other and further relief as this Court may deem just and proper.

## VIII.    JURY TRIAL DEMANDED

75.    Plaintiff hereby demands a jury trial for all claims so triable.

CLASS ACTION COMPLAINT - 20

DATED:      November 4, 2024          Respectfully Submitted,

/s/ *Blake Hunter Yagman*
Jennifer Czeisler
jen.czeisler@sterlingtonlaw.com
Edward Ciolko*
ed.ciolko@sterlingtonlaw.com
Blake Hunter Yagman
blake.yagman@sterlingtonlaw.com
STERLINGTON, PLLC
One World Trade Center
New York, New York 10004
Tel.:   212-433-2995

POLLOCK COHEN LLP

/s/ *Adam Pollock*
Adam Pollock
Anna Menkova
111 Broadway, Suite 1804
New York, NY 10006
Adam@PollockCohen.com
Anna@PollockCohen.com
Tel.: (212) 337-5361

*Counsel for Plaintiff and the
Proposed Class*

*\*Pro Hac Vice Forthcoming*

CLASS ACTION COMPLAINT - 21